

FILED

03/24/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2017

**IN RE CHARLES A.**

**Appeal from the Circuit Court for McMinn County**
**No. 2015-CV-158    Lawrence Howard Puckett, Judge**

_____

**No. E2016-01757-COA-R3-PT**

_____

This is a termination of parental rights case.  Mother appeals the termination of her parental rights to the minor child on the grounds of abandonment and persistence of conditions.  Because the record does not contain an adjudicatory order of dependency and neglect, we reverse the ground of persistence of conditions.  We affirm the termination of Mother's parental rights on the ground of abandonment and on the trial court's finding that termination of Mother's parental rights is in the child's best interest.  Reversed in part, affirmed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed in Part, Affirmed in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Kathleen Hodge, Athens, Tennessee, for the appellant, Olivia B.

Donald (Trey) Winder, III, Athens, Tennessee, for the appellees, Randy M. and Dawana M.

**OPINION**

**I. Background**

The minor child at issue in this case, Charles A. (d.o.b. May 2010),[1] was born to Appellant Olivia B. ("Mother") and Jeffrey A. ("Father").[2]  Randy M. and Dawana M.

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] Father voluntarily surrendered his parental rights and is not a party to this appeal.

(together, "Appellees") are Charles A.'s paternal aunt and uncle. Charles A. lived with Mother for the first year of his life. By May of 2011, however, the child was living with Appellees. In January of 2013, Mother regained custody, but Appellees remained deeply involved in the life of the child including the granting of visitation privileges.[3]

In the Fall of 2014, Appellees petitioned the Juvenile Court of McMinn County for temporary custody of Charles A. On October 6, 2014 the juvenile court issued a "Temporary Order," finding that Charles A. was dependent and neglected and, specifically, that Charles A. was "in need of a custodian due to the mother being arrest[ed] for DUI and presently incarcerated." The record shows that Mother was arrested for DUI while Charles A. was in the car. Based on Mother's arrest and incarceration, the trial court granted temporary custody of Charles A. to Appellees. Charles A. has lived with Appellees since that time.

In April of 2015, Mother was found guilty of DUI in McMinn County. On May 7, 2015, Appellees filed a petition to terminate Mother and Father's parental rights on grounds of: (1) abandonment by willful failure to visit and support; and (2) persistence of the conditions that led to the child's removal from Mother's home. The trial court found that Mother was indigent and appointed an attorney to represent her; the trial court also appointed a guardian ad litem for Charles A. On November 13, 2015, Mother filed a response to Appellees' petition, wherein she demanded strict proof of abandonment and denied any drug abuse.

The trial court heard the petition to terminate parental rights on May 23, 2016. By order of July 15, 2016 and amended order of July 21, 2016, the trial court terminated Mother's parental rights to Charles A. on grounds of abandonment by willful failure to support and visit and persistence of the conditions that led to Charles A.'s removal from Mother's home. The trial court also found that termination of Mother's parental rights is in Charles A.'s best interest. Mother appeals.

## II. Issues

Mother raises five issues for review, which we state as follows:

1. Did the trial court err in finding that Appellees had proven, by clear and convincing evidence, the ground of persistence of the conditions that led to the child's removal from Mother's home.

2. Did the trial court err in finding that Appellees had proven, by clear and

---

[3] The record does not contain any documentation concerning the early custody arrangements. This information is taken from the parties' appellate briefs and the testimony at the hearing on the petition to terminate Mother's parental rights.

convincing evidence, the ground of abandonment by willful failure to support and willful failure to visit.

3. Did the trial court err in finding that Appellees had proven, by clear and convincing evidence, that termination of Mother's parental rights is in the child's best interest.

4. Did the trial court err in denying Appellant's motion to continue.

5. Did the trial court err in admitting inadmissible evidence.

### III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. **Stanley v. Illinois**, 405 U.S. 645, 651 (1972); **Nash-Putnam v. McCloud**, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. **Nash-Putnam**, 921 S.W.2d, at 174-75 (citing **Santosky v. Kramer**, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." **In re W.B.**, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the children's best interest. Tenn. Code Ann. § 36-1-113(c); **In re D.L.B.**, 118 S.W.3d 360, 367 (Tenn. 2003); **In re Valentine**, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. **Santosky**, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the children's best interests must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); **In re Valentine**, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." **In re M.J.B.**, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. July 12, 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review under Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de*

*novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. Grounds for Termination of Parental Rights

As noted earlier, the trial court relied on the following statutory grounds in terminating Appellant's parental rights: (1) persistence of the conditions that led to the child's removal from Appellant's home, Tenn. Code Ann. § 36-1-113(g)(3); and (2) abandonment by willful failure to visit and willful failure to support, Tenn. Code Ann §§ 36-1-113(g)(1), 36-1-102(1)(A)(i). Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." ***In re Angela E.***, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Accordingly, we will review both of the foregoing grounds.

## A. Persistence of Conditions

As noted above, the trial court terminated Mother's parental rights on the statutory ground of persistence of the conditions that led to child's removal under Tennessee Code Annotated Section 36-1-113(g)(3). The statute defines persistence of conditions as follows:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The purpose behind the "persistence of conditions" ground for terminating parental rights

is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H*., 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds* by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). In *In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 7, 2005), this Court held that "based on the statutory text and its historical development, [the ground of persistence of conditions found in Tennessee Code Annotated Section 36-1-113(g)(3)] applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 872. In *In re Audrey S.*, this Court specifically concluded that a preliminary hearing order was not a sufficient adjudication of dependency and neglect so as to support the ground of persistence of conditions in a termination of parental rights case:

> The March 28, 1996 temporary custody order and preceding restraining order were entered in a dependency and neglect proceeding, but they were not based on a judicial finding that Audrey S. was dependent, neglected, or abused. The statutes and rules governing procedure in the juvenile courts provide for three types of hearings in cases where a child is alleged to be dependent, neglected, or abused: (1) preliminary hearings; (2) adjudicatory hearings; and (3) dispositional hearings . . . . The function of the adjudicatory hearing is to determine whether the allegations of dependency, neglect, or abuse are true. Tenn. R. Juv. P. 27(b), 28(a), (f)(1). The Tennessee Rules of Evidence apply, Tenn. R. Juv. P. 28(c), and the juvenile court's finding that a child is dependent, neglected, or abused must be based on clear and convincing evidence, Tenn. Code Ann. 37-1-129(c); Tenn. R. Juv. P. 28(f)(1)(i)-(ii). The purpose of the dispositional hearing, which follows the adjudicatory hearing, is to determine the proper placement for a child who has been found to be dependent, neglected, or abused. Tenn. .Code Ann. § 37-113(a) (2001); Tenn. R. Juv. P. 32. As its name implies, a preliminary hearing occurs prior to both the adjudicatory hearing and the dispositional hearing. Tenn. Code Ann. § 37-1-117(c); Tenn. R. Juv. P. 6(c), 16(a). Its function is to allow the juvenile court to decide whether the child should be removed from the parent's custody pending the adjudicatory hearing. Tenn. Code Ann. § 37-1-117(c); Tenn. R. Juv. P. 16(c). The juvenile court is allowed to consider reliable hearsay in making its decision, Tenn. R. Juv. P. 16(a), and it can order the child removed from the parent's custody based on a finding of "probable cause" that the child is a dependent, neglected, or abused child, Tenn. Code Ann. § 37-1-114(a)(2) (2001).

> The March 28, 1996 temporary custody order resulted from a preliminary hearing, not an adjudicatory hearing, and the restraining order

was designed merely to preserve the status quo in advance of the preliminary hearing. The temporary custody order contains an implicit judicial finding of probable cause that Audrey S. was dependent, neglected, or abused. It does not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused. The juvenile court never held an adjudicatory hearing on Wilma S.'s petition for temporary custody of Audrey S., and there is no other court order in the record prior to the filing of the joint termination petition that reflects a finding of dependency, neglect, or abuse with respect to Audrey S. Accordingly, the juvenile court erred in relying on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Jamie F.'s parental rights to Audrey S.

*In re Audrey S.*, 182 S.W.3d at 874-75 (some citations omitted). Likewise, in the instant case, the record contains only a "Temporary Order" from the Juvenile Court of McMinn County. While this "Temporary Order" concludes that Charles A. is dependent and neglected in that Mother had been arrested and incarcerated for DUI, it specifically holds that "temporary custody" will be given to Appellees "until the court date of October 21, 2014." In fact, at the hearing on the petition to terminate parental rights, Appellees' counsel refers to this order as "an emergency order based on [Mother's] arrest." The trial court then asks, "[I]t was an emergency order so I take it there was no . . . final disposition on the dependency and neglect." Appellees' counsel replies, "That's correct." We glean that the October 21, 2014 date, which is referenced in the "Temporary Order," was set for the adjudicatory hearing on dependency and neglect; however, there is no indication that an adjudicatory hearing actually occurred. As such, we are left with only a "Temporary Order" entered after a preliminary hearing before the juvenile court. Under the holding of *In re Audrey S.*, such temporary orders are not sufficient to support termination of parental rights on the ground of persistence of conditions. Accordingly, we reverse this ground for termination of Mother's parental rights.

### B. Abandonment

The trial court also found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of abandonment by willful failure to pay support and willful failure to visit pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) and Tennessee Code Annotated Section 36-1-102(1)(A)(i). In pertinent part, Tennessee Code Annotated Section 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

- 6 -

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated Section 36-1-102 defines "abandonment," in relevant part, as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i)    For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i). As found by the trial court, the relevant, four-month time period in this case is February 7, 2015 to May 7, 2015.

In *In re Audrey S*., this Court discussed willfulness in the context of termination of parental rights cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.... In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing ....

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

***In re Audrey S.***, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted).

### 1. Willful Failure to Support

For purposes of Tennessee Code Annotated Section 36-1-102(1)(A)(i), "token support" means that the support, under the circumstances of an individual case, is not significant considering the parent's means. Tenn. Code Ann. § 36-1-102(1)(B). This Court has held that failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." ***In re J.J.C.***, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (quoting ***In re Adoption of Muir***, No. M2002–02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)).

In its order terminating Mother's parental rights, the trial court made the following, relevant findings concerning the ground of abandonment by willful failure to support:

> [Appellees] proved by clear and convincing evidence that the grounds for termination [of Mother's parental rights by] abandonment by willful failure to support exist as the mother admitted during her testimony that she has not provided support for the minor child during the four (4) months prior to the filing of this action, thus confirming the undisputed proof of the same.

Turning to the record, Appellees testified that since Charles A. has lived with them, Mother has provided no financial support. Mother initially testified that she did not know to provide support because there was no court order requiring her to pay support. In Tennessee, "[a] parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." ***In re Jacobe M.J.***, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (quoting Tenn. Code Ann. § 36-1-102(1)(H)). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." ***Id.*** Accordingly, Mother's argument, in this regard, is not persuasive. Regardless, as set out below, in her testimony, Mother later acknowledged that she was responsible for providing for her child.

At the time of the hearing on the petition to terminate her parental rights, Mother was not employed. She testified that she has not been employed since 2011. When asked whether she is disabled, Mother answered, "No. I'm going for my disability now." Mother provided no proof that she has, in fact, sought disability. Mother went on to testify that she occasionally cleans houses for $75 to $125, but she could not confirm her exact earnings. At the time of the hearing, Mother lived with her parents, who paid for her food and vehicle.

Mother testified that she had sent cards to Charles A. and that she had bought him a birthday gift, but admitted that the gift was "still in the closet at my parents' house." Mother went on to testify, in relevant part, as follows:

Q. You've still not paid any type of financial support for [Charles A.], correct?

A. Correct.

*** 

Q. You didn't take the step of paying to help support your child, correct?

A. Correct.

Q. A responsibility that you acknowledge that you have, correct?

A. Correct.

From the foregoing testimony and the entire record, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by willful failure to support.

### 2. Abandonment by Willful Failure to Visit

In its order terminating her parental rights, the trial court made the following, relevant findings concerning Mother's failure to visit:

The Court finds th[at] [Appellees] proved[,] by clear and convincing evidence[,] the ground for termination of [Mother's] parental rights by abandonment by willful failure to visit . . . [Mother] testified that she could have visited with the minor child in the four months prior to the filing of this action, and the last meaningful contact [Mother] had with the child was October 6, 2014. The Court also finds the mother never took any court action to be reunited with, or to exercise time, with her child. The Court finds the parties have the same phone numbers and [Appellees] have lived at the same location for years, and the mother was aware of the means of availing herself of visits, but she did not utilize the phone numbers, or attempt to visit. The Court finds mother made no attempt to see the child or communicate with the child after October 6, 2014.

The record supports the foregoing findings. Mother testified, in relevant part, as follows:

Q. You've not visited with [Charles A.], correct?

- 9 -

A. Correct.

Q. The last time [Charles A.] saw you, was it when a police officer pulled him out of the back of your [car] when you were being arrested for DUI?

A. They had—no. [Charles A.] was asleep when the police pulled me over.

\*\*\*

Q. So the last time [Charles A.] would've seen you was at 3:30 in the morning, approximately, when you were drunk and you put him in your car to drive away, correct?

A. Right.

Although Mother went on to testify that she had tried to contact Appellees to set up visits with Charles A., she stated that the Appellees had not called her back. Appellees testified, separately, that Mother had not contacted them. For example, Mr. M. testified:

Q. Do you have any recollection of [Mother] making any type of effort to reach out and communicate with [Charles A.] from October 2014 until May of 2015?

A. No.

Mother admitted that the Appellees had lived at the same location and had the same phone number during the entire time that Charles A. has lived with them. Mother admitted that she had not sought visitation through the courts although she knew how to do that and conceded that it was her responsibility to seek visitation:

Q. You didn't take the step of visiting your child, correct?

A. Correct.

\*\*\*

Q. A responsibility that you acknowledge that you have, correct?

A. Correct.

From the foregoing testimony and the entire record, we conclude that there is clear and convincing evidence to support the trial court's termination of Mother's parental rights on the ground of abandonment by willful failure to visit.

Although we reverse the trial court's finding as to the ground of persistence of conditions, in order to terminate parental rights, the moving party need only establish one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c). Because we have affirmed the remaining ground that the trial court relied on in terminating Mother's parental rights, i.e., abandonment by willful failure to visit and support, we proceed to the review of the trial court's finding that termination of Mother's parental rights is in the Charles A.'s best interest.

## V. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent. . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . .
>
> ***
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not

- 11 -

exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White*, 171 S.W.3d at 194.

In holding that termination of Mother's parental rights is in the child's best interest, the trial court primarily relied on the statutory criteria specifically set out above and found, in relevant part, that:

> 4. The Court finds the proof revealed the [Mother] is still working on herself, and as she admitted this self-improvement would need to be accomplished in order for her to be able to be the kind of parent that she needs to be. The Court also finds the proof revealed [Mother's] efforts have been diverted along the way by relationships with men, and a lifestyle that is not stable enough, as confirmed by her own admissions . . . to permit the kind of parental involvement necessary to be a fit parent.
>
> 5. The Court finds the proof revealed the best the [Mother] could offer the child was to rely on her parents for housing and financial support; however, her parents did not attend the trial to testify in her favor.
>
> 6. The Court also finds the termination of [Mother's] parental rights is in the best interest of the minor child as [mother] has not made an adjustment to her circumstances, conduct, or conditions so as to make it safe for the child to be in the home of the [Mother].
>
> ***
>
> 7. [T]he Court finds [that] . . . Mother has not made an adjustment to her circumstances, conduct or conditions as to make [it] safe and in the child's best interest to be in [Mother's home].

8. The Court finds [that] . . . [Mother] has not maintained regular visitation or other contact with the minor child.

9. The Court finds by clear and convincing evidence the [Appellees] have established a strong relationship with the child.

The record supports the trial court's findings regarding Charles A.'s best interest. Concerning the first statutory factor, i.e., whether the parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent, the record shows that Mother made a decision, while under the influence, not only to drive a vehicle, but also to have Charles A. as a passenger in the car. Concerning this incident, Mother testified, in relevant part:

Q. Where were you going at 3:30 in the morning?

A. I was going back to where I reside . . . .

Q. You acknowledge that 3:30 in the morning is an inappropriate time for a child his age to be out riding around, correct?

A. Correct.

Q. You also acknowledge that 3:30 in the morning or anytime for that matter is an inappropriate time for you driving a minor while you're under the influence of alcohol.

A. Correct.

Q. But yet you chose to do that, correct?

A. Yes, I did.

Q. How often as a practice would you drive [Charles A.] and be under the influence of alcohol?

A. That was the first time in a long long time that I had drunk.

Q. How long is a long time?

A. Several, several, several months

Mother testified that, since her October 2014 arrest, she has completed a twelve-step program to address her alcohol and drug use. However, there is

- 13 -

no proof in the record to substantiate her testimony, e.g., a certificate of completion. While Mother should be given credit for her decision to address her substance abuse issues, in order for her to be a parent to Charles A., there would need to be proof that her recovery is permanent. Concerning her current efforts, Mother testified:

[O]nce I got out of jail I figures [sic] out the steps I have got to take [] to get myself well . . . so I will be able to take care of [Charles A.], and that is hard to do when you think you can control everything by your next drink . . . and that's the only thing I can honestly say is, I haven't been drinking . . . . I have took [sic] parenting classes . . . . I've had NA classes, I've [had] my 12 and 24 step program with the drugs and alcohol. They'll tell you the first couple of years of getting out of that [are] the hardest and it was, and everybody's been saying [that one will] relapse and stuff. Well, I had my relapse and I don't care to ever go back down the road, the drinking or anything like that ever again because I see what it's done.

Q. Did you complete your 12-step program?

A. Yes.

Q. Are you continuing in your steps to maintain your sobriety?

A. I got my book that I still have and I go through. Every once in a while I'll call my sponsor and, you know, hey, it's been one of those kind of days . . . It's not that I want to drink . . . .

The foregoing testimony does not preponderate in favor of a finding that Mother's adjustments are permanent, i.e., she admits to having relapsed, and her contact with her sponsor appears sporadic. Mother's abuse of alcohol has, in the past, put Charles A. in harm's way. Without sufficient proof to show that Mother's sobriety is secure, we agree with the trial court's finding that it would not be in Charles A.'s best interest to be in Mother's custody.

Mother's living situation is also troubling. During her testimony, Mother admitted that she has moved nine times in Charles A.'s lifetime (6 years). At the time of the hearing, Mother was residing with her parents, whom she admitted were not in good health. As noted by the trial court, Mother's parents did not attend the hearing; accordingly, there is no evidence as to whether Mother's parents' home would be safe for Charles A. Regardless, Mother testified that she does not stay with her parents every night. Rather, she spends "a couple of days a week" with her current paramour. Mother admitted to the lack of stability in her life:

Q. Don't you think that [the fact that you have lived in nine different places] shows a lack [of] stability on your part as far as being able to provide a home for you and most importantly for our purposes a home for [Charles A.]

A. That does show a lack, yes.

In addition to her transient lifestyle, Mother is unemployed and has no means of support except for her parents and her paramour. There is no indication that she would be able to independently support this child. In fact, Mother testified that, "I probably could work physically, yes, I think I could. Mentally and emotionally, no, I am not stable enough to . . ." Despite Mother's allegation that she is mentally and emotionally unable to work, there is no evidence to support her statement. Regardless, due to her lack of income, Mother has never paid support for Charles A. The record shows that all of his needs have been provided by the Appellees. Appellees testified that they view Charles A. as their own child, that he is part of their family, and that they will always care for him and provide for him. On the other hand, Mother has not seen Charles A. since her arrest in October of 2014. It is apparent from Mother's testimony that she knows very little about Charles A.'s daily life at this point. For example, Mother testified, in relevant part, as follows:

Q. Who is [Charles A.'s] best friend?

A. Got me.

Q. Who was his teacher this year?

A. Got me. . .

Conversely, Charles A.'s guardian ad litem testified, in relevant part, that:

I was able to speak to the child . . . . I was able to interact with him, even though he was five years old, soon to be six, I found him to be very, very intelligent. He was aware that the [Appellees] were not his biological parents, but he repeatedly told me. . . that he wished for them to be his permanent parents. I spoke to him at length. I watched the interaction that he had with the [Appellees,] and it is obvious that there is a deep emotional attachment between the child and the [Appellees] and, as such, I feel it is in the [child's] best interest given all the factors that the child remain with the [Appellees].

Given the fact that Charles A. has lived five of his six years with Appellees, there is no indication that he has any bond with Appellant. From the totality of the circumstances

- 15 -

and the record as a whole, we conclude that the evidence preponderates in favor of the trial court's findings and these findings provide clear and convincing evidence that termination of Mother's parental rights is in Charles A.'s best interest.

## VI. Motion for Continuance

Before the May 23, 2016 hearing commenced, Mother's attorney made an oral motion for a continuance, and the trial court denied the motion. On appeal, Mother argues that, "[g]iven the importance of all information being necessary for the Court in order to terminate the parental rights of a biological parent, and of the parent's right to bring all exonerating information before the court, [M]other contends that the denial of her motion to continue was an abuse of discretion."

Tennessee Code Annotated Section 20-7-101 provides that "[c]ontinuances ... may always be granted by the court, upon good cause shown, in any stage of the action." The decision whether to grant or deny a request for a continuance is, therefore, a matter within the sound discretion of the trial court. *Sanjines v. Ortwein & Assocs., Inc.*, 984 S.W.2d 907, 909 (Tenn.1998) (citing *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn.1997)). An appellate court cannot interfere with the trial court's decision unless the court's decision constitutes an abuse of discretion and causes prejudice to the party seeking the continuance. *Sanjines.*, 984 S.W.2d at 909. The Tennessee Supreme Court has stated that "under the abuse of discretion standard, a trial court's ruling 'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn.2000)). This standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn.1998). Rather, an abuse of discretion occurs only when the trial court "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Eldridge*, 42 S.W.3d at 85 (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999)).

As grounds for the continuance, Mother's attorney stated that:

It came to my attention about an hour ago, from my client, that she represented to me and to the guardian ad litem that she brought a packet of information, that she felt would work in her favor, to my office in February. I was not in my office at the time. I was not aware that she brought it to my office. I have communicated with my office and they don't recall it being dropped off. They've searched the office and they cannot find it so I would like to make a motion to continue based on the fact that I don't have this information . . . .

Appellees' counsel and the guardian ad litem opposed the motion. The trial court inquired as to the nature of the documents:

> Well, would it not help you and me and the other parties to know what this paperwork is supposed to have in it that's so pertinent that couldn't have been conveyed verbally by the client? I mean, the paperwork is probably not admissible.

Mother's attorney answered that the documents allegedly pertained to treatment that Mother had completed, to wit:

> Well, from what I understand, Your Honor, documents have to do with the fact that [Mother] went to treatment and completed anger management, but they don't address the—there was no evidence in the documents concerning some of the other things that the petitioner was arguing, namely, whether or not there's been any contact with the child or whether there was financial support for the child, and I think those were two of the allegations made by the petitioners.

The trial court then opined that,

> [i]f [Mother] testified, I might allow [the documents] to be entered as exhibits, just to show dates and things like that. I might allow it. I don't know. I don't like to shoot in the dark, but she'd need to testify.

Mother's attorney then stated that Mother would not testify, and the trial court denied the motion for continuance, stating "I will deny the motion because those documents would not be admissible, it doesn't appear to me, and there is no need to continue the case if that's what's going on here . . . ." Despite her attorney's statement that she would not testify at the hearing, Mother did, in fact, testify. However, during her testimony there was no attempt to introduce any documents related to the completion of anger management or treatment; nonetheless, Mother was allowed to testify that she had participated in parenting classes and had completed a twelve-step program.

In light of Mother's attorney's statement that the documents, which allegedly necessitated a continuance, were not germane to the question of abandonment by willful failure to visit or support, but were relevant (if at all) to the question of whether the conditions that led to the child's removal still persist, this Court's ultimate holding that, in the absence of an adjudicatory order on dependency and neglect, the ground of persistence of conditions cannot lie renders the purported documents irrelevant. In view of our holding, and in light of the fact that Mother was allowed to testify as to her treatment and classes, we cannot conclude that the trial court's denial of a continuance was an abuse of discretion.

## VII. Admission of Evidence

In her final issue, Mother argues that the trial court erred in allowing Appellees to testify regarding their belief that mother used illegal substances and had an unstable lifestyle. Mother first alleges that Randy M. was allowed to testify as follows:

Q. Did you see [Mother] do anything that would've caused you great concern?

A. Yes.

Q. What would've caused you any concern?

A. Drinking and a lot of different people at her house, you know.

Mother also cites the portion of Randy M.'s testimony where he explains the circumstances that led to Appellees seeking custody of Charles A., when the child was one year old. Mr. M. stated that he received a call from a relative, who told Mr. M. that Mother and Father were fighting. At this point, Mother's attorney objected on the ground of hearsay, and the trial court sustained the objection. Mother also alleges that the trial court erred in allowing Mr. M. to testify concerning her DUI arrest in October of 2014. Mr. M. stated that "the police report reads that [Charles A.] was in the back seat." Mother's attorney objected to Mr. M. testifying as to what was in the police paperwork. Appellees' attorney then moved for entry of Trial Exhibit 1, which is the "Temporary Order" entered in the juvenile court. As discussed above, this order states that Charles A. "is in need of a custodian due to the mother being arrested for DUI . . . ." Trial Exhibit 2 is the General Sessions Court of McMinn County's judgment, finding Mother guilty of DUI. Finally, Mother's attorney objected to Mr. M.'s testimony that during "[t]he first twelve months [of Charles A.'s life] [Mother] lived [in] five different places, and then it's been housing projects, her mom's, her sister, her—a houseboat on the lake and with numerous men."

Mother also objected to Dawana M.'s testimony that she was concerned with Mother's "drinking and aggressive behavior." The trial court sustained Mother's attorney's objection, limiting Mrs. M.'s testimony to "what you personally observed." During her testimony, Mrs. M. also used the term "moral duty" to refer to Appellees' role in Charles A.'s life. Mother's attorney objected to this term, and the trial court allowed Appellees' attorney to clarify. Appellees' attorney then questioned Mrs. M. concerning the specific care Appellees provide for Charles A.

As this Court stated in *Delapp v. Pratt*:

Issues regarding admission of evidence in Tennessee are reviewed for

abuse of discretion. ***Dickey v. McCord***, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." ***Id***. Our Supreme Court discussed the abuse of discretion standard in ***Eldridge v. Eldridge***, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn.2001) (citations omitted).

> Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. ***Overstreet v. Shoney's, Inc***., 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. ***Id***. When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." ***Id***.

***Delapp v. Pratt***, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004).

Turning to the record, the testimony that Mother objected to at trial and on appeal is largely corroborated by Mother's own testimony, *see supra*. For example, Mother testified that she was guilty of DUI and that Charles A. was a passenger in the car when she was stopped. Trial Exhibits 1 and 2 corroborate Mother's testimony. Mother also testified that she has trouble with alcohol and that she is trying to remain sober. Mother candidly testified concerning the lack of stable housing and the fact that she had lived in at least nine places since Charles A. was born. In view of the fact that the disputed testimony is corroborated by independent evidence in the record, we cannot conclude that the trial court abused its discretion in allowing Appellees to testify regarding Mother's instability, use of illegal substances, or DUI arrest. However, even if we allow, *aruguendo,* that the trial court's ruling on this testimony was erroneous, the corroborating evidence would render such error harmless. ***In re C.M***., No. M2014-02571-COA–R3-JV, 2015 WL 9311287, \*19 (Tenn. Ct. App. Dec. 18, 2015) ("The [disputed] testimony is corroborated by independent evidence in the record. In light of the independent testimony corroborating [the disputed] statements, we conclude that the trial court's decision to

overrule Appellants' objection to the testimony was, at most, harmless error.").

## VIII. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Mother's parental rights on the ground of persistence of the conditions that led to the child's removal. We affirm the termination of Mother's parental rights on the ground of abandonment and on the trial court's finding that termination of Mother's parental rights is in the child's best interest. The case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Olivia B. Because Appellant is proceeding in forma pauperis in this appeal, execution for costs may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE